We'll hear the first case on calendar, NCO Ltd. v. O.W. Bunker USA. Thank you. Thank you. Good morning, Your Honors. Robert O'Connor from Montgomery, McCracken, Walker & Rhodes for the appellant, O.W. Bunker USA. Your Honors, this appeal concerns the ongoing efforts by a liquidating debtor to collect long overdue payments from its customers. In fall of 2014, O.W. USA sold and supplied marine fuel to Norwegian Cruise Lines and its vessel Norwegian Spirit at a port in Europe. The vessel undisputedly received and consumed the fuel. However, Norwegian still has not paid O.W. USA. But no one disagrees that NCL paid someone, do they? NCL did pay somebody, yes, Your Honor. Just checking, because what you're asking is now that they paid twice. It depends on your perspective, Your Honor. From the perspective of O.W. USA's liquidating debtor, NCL has not fulfilled its obligations under the contract, and that's to the detriment of all of O.W. USA's creditors. Has O.W. Bunker thought of suing the person who did get paid? The person who did get paid is a Greek entity, Your Honor. Correct. O.W. Bunker would likely have to pursue them in Greece. I think also a valid question is whether that company can be impleted into the United States. At this point, Your Honor, O.W. USA does not have any intention to sue that third party. The intention is to collect from Norwegian Cruise Lines pursuant to the contract. I understand. All right, continue. O.W. USA commenced arbitration proceedings in London pursuant to its contract and has, in fact, already served claim submissions. Norwegian responded by seeking an injunction in the U.S. courts. The district court held only one hearing concerning whether a preliminary injunction should issue in this case. No witnesses testified, and Norwegian did not even offer its foreign declarants for examination. On the other hand, O.W. USA requested a full trial pursuant to the Federal Arbitration Act, Sections 3 and 4. Nonetheless, after just that one half-day hearing, the district court granted Norwegian's preliminary injunction, and O.W. USA appealed. O.W. USA raises two primary issues. Did the district court incorrectly interpret and apply English law to the contract when it found that O.W. USA's London arbitration clause was superseded by a third party's forum selection clause? It does seem odd that in a dispute between the parties to the NCL and the O.W. Bunker's USA contract, I mean, that's the nature of the dispute between the two of you, right? Yes, Your Honor. That somehow a subcontract, if that is truly a subcontract, or perhaps a totally independent contract, which has a choice of law, which is imposed to one of your subsidiaries, for which there's no finding that they're either your alter ego or your agent, Correct, Your Honor. somehow gets imputed into the dispute between the two of you. Yes, Your Honor. And counsel has conceded an oral argument before the district court that each of the contracts in this chain of contracts, and I will point the court to Go ahead and finish your thought. I will point the court to page A128, and there's a flow chart of the chain of contracts in this case, and counsel at oral argument has already conceded that those contracts are separate and distinct. They do not intersect. Was the buyer in the contract between Malta and EKO? The buyer in that contract, I assume, would be O.W. Malta. However, that contract is not in evidence in this case. So the district court didn't have the O.W. Malta, EKO contract in front of it? It did not have that contract nor . . . How did it then . . . Okay. What did it have from EKO? It had a conclusory self-serving declaration that was originally submitted to the bankruptcy court without penalty of perjury. Did it have the delivery receipt, which was handed to the captain of the ship or to some representative of the ship at the time of the delivery like I see in all the other O.W. Bunker cases? Yes, it did, Your Honor. And the district court, like in many of the other O.W. Bunker cases, concluded that the language on the delivery receipt was immaterial because it was after the formation of the contract. How could it have concluded then that there was some form of insistence? A, how did it conclude that the term required or that the EKO contract required Greek law? And B, how could it conclude that EKO insisted upon it? Your Honor, Norwegian has put in a copy of EKO's purported terms and conditions along with its papers. The declaration from EKO's counsel does not authenticate that document. However, if we take that on its face, the law and jurisdiction clause in that contract is Greek law parias courts. Did you argue agency that, did you argue in front of the district court that this was really, you had to really come to grips with some form of agency interpretation to ultimately view this back to NCL, to somehow impute that NCL's acceptance of the agreement was as a result of all the subcontractors that O.W. Bunker pushed this through? No, Your Honor. From the perspective of the appellant O.W. Bunker, we were arguing these were separate and distinct contracts. And the only relationship that mattered for the district court was as between O.W. USA and NCL. Did your opponent argue agency? I don't believe so, Your Honor. And were the contracts conceded to be separate and independent? They were. Norwegian's counsel. Judge Forrest had the same problem with it. Correct, Your Honor. Then it seems extremely curious to me that between O.W. Malta, that maybe there was some form of insistence as to O.W. Malta that Greek law would apply if EKO had a dispute with O.W. Malta. But how does that insistence remotely move back up the chain of separate and independent contracts and somehow become a term to which NCL is impliedly agreeing to because of a third-party supplier? Your Honor, the district court actually, although it interpreted and applied English law or attempted to do so, and specifically the Clause L4, which required insistence, the district court looked at all of that and then eventually applied a completely different rule and said, wait a minute, O.W. Malta accepted EKO's terms. Those terms impliedly pass up through the chain of contracts such that they bind to O.W. USA. You did it on the basis that they were in the same community in Greece and they knew each other and they knew what the terms were. That's what he said. He took that leap. That's correct, Your Honor. And our argument is that O.W. Malta's acceptance of EKO's terms, if there is such acceptance, there's no evidence on the record. But if there is acceptance of O.W. Malta's terms, that does not trigger Clause L4, which requires EKO to insist that the buyer with a capital B who— To whom were they required to insist? Your Honor, that was disputed in the district court, and I believe that's immaterial. Who do you argue they were required to insist? I believe that that could have been directed to O.W. Malta. We haven't seen any insistence whatsoever, so I'm not entirely sure. You keep referring to the terms, and you're saying the terms don't amount to insistence, but they're terms and conditions. That's the condition for fueling the ship, which, if it doesn't get fueled, sits in the harbor and can't perform the contract for all of the passengers on board. So if EKO required that as a condition, why is that not an insistence? Your Honor, EKO's insistence has to be such that Norwegian is bound by the terms. If we look at EKO's terms and conditions, specifically page A75 of the Joint Appendix, it says that this agreement shall be governed by and construed in accordance with Greek law, and any dispute shall be submitted to Greek courts. EKO's terms and conditions, assuming these terms and conditions actually do apply, are expressly limited to this agreement, which is between EKO and O.W. Malta. There's no reference to Norwegian or the vessel. It doesn't say anything as to the ship itself. That's correct, Your Honor. According to you, there's going to be three or four contracts, and separate payments can be made under all these contracts. It sounds to me as though the original contract contained a term that was designed to assure that you didn't have exactly the kinds of problems we have now, that if you have an insistence, and it seems to me a condition is an insistence, then it works all the way up. You don't insist that they pay twice. Your Honor, insistence applies a heightened threshold. If the intent of O.W. Bunker in its own terms and conditions was for the third-party physical supplier's terms to always pass through, it could have left the word insistence out of the contract. It would be odd indeed even if they had. If they'd said to O.W. Malta, who has no contractual relationship whatsoever with the ship, and said, we will require that the ship adhere to our terms and conditions. Any prior arrangements for the ordering of these bunkers shall be governed by Greek law when it's recognized that each of these are independent and conceded that they're independent. That would kind of stand contract law on its head by having strangers to earlier agreements which are deemed independent altered by this separate and independent arrangement by Malta. There would be absolutely no way of knowing what the arrangements were. Yes, Your Honor. It certainly would create a slippery slope. It sounds as though that's a question that would also be well put to your adversary. So you've reserved rebuttal. We shall hear you then. Good morning, Your Honor. Jake Rodriguez on behalf of NCL. Many good questions. If I could just start with something that . . . I hope that includes Judge Pooler. Absolutely. Many good questions. Actually, I'll start with Judge Pooler. We start as a basis that this case . . . You don't want to pay twice, right? That's correct. We start from the basis that this case is unique. Judge Pooler, you raised the issues of equity. The issues of equity were actually raised, Judge Wesley, in your case, the hay pig loin case. Where you cited Judge Friendly for the proposition that requiring a party to pay twice for the same bunker supply was an extreme injustice. Of course, that's exactly what's happened in a number of these OW bunker cases, like the Tamra and ING. So, this is not new to me. Correct. And it's unfortunate. And certainly, if you had a lien, you were threatened with a lien. And I understand why you ended up paying them. I get that. But that doesn't make you unique in the context of the wreckage that's been wrought by OW bunker's bankruptcy. Yes, Your Honor. I would say that . . . This is a question of sorting out the estate and figuring out whether this constitutes a preference or not, right? Well, I think what it specifically deals with . . . Let me ask you this. If you didn't have a lien under Greek law, which you couldn't assert, wouldn't this be a preference? Yes, is the answer to that. Yeah, it would be. We've already crossed that bridge in ING. Right. Okay. What I would say, though, in respect to some of the other cases, is that . . . For example, Tamra. Distinguishable on a number of different points. We're the vessel owner. We're a party to a contract. I got that. I completely understand that. And we're not just being asked to pay twice for the same bunker supply. We're being asked to pay $2.5 million on a transaction where O.W. would have stood to make $131 in profit as a starting point. This is a contract case, and I understand . . . Sure. I understand the difficulty that you find your client in, but we don't write just to resolve this. Sure. We write to explain to individuals contractual relationships and basic contract principles. How does . . . Is the contract between NCL and O.W. Bunker's U.S. Is that separate and independent from the contract that EKO entered into with O.W. Malta? Yes, Your Honor. Separate and independent? Separate and independent. Then how does a term in the O.W. Malta contract . . . Say O.W. Malta agreed to Greek law. How does O.W. Malta's acceptance of that imputable to you? Yes, Your Honor. Great question. What principle of law imputes that acceptance to you? Your Honor, I believe the contract itself and the terms of O.W.'s contract in L-4 specifically impute that to us. You told me they're separate and independent. They are. But in that contract . . . In L-4 on the O.W. Malta . . . or, excuse me, the O.W. U.S. NCL contract says, if there's a third-party supplier and they insist upon it, their choice of law governs this agreement, right? If there's a third . . . Does it say, or any subcontracts made by independent parties? No. What it says is that the bunker supply transaction that they are subject to, that they are involved in with, in this case Malta, right, is subject to Greek law and Piraeus Forum. And what we're dealing with in terms of the insistence provision that each of you, I believe, has raised, is that the insistence which flowed to O.W. Malta by ECHO . . . The flow of events is this, as we understand them. Malta says, I need fuel at the request of O.W. U.S.A. Back-to-back contracts. O.W. U.S.A. contract with O.W. Malta on the same exact general terms and conditions. Malta reaches out to ECHO and says, I need a fuel supply for the NCL vessel. ECHO says they had a history of dealing for over 10 years, a course of dealings where the declarations established that they had their own terms and conditions that applied to these bunker transactions. ECHO says, of course, I'll provide you my fuel on my terms and conditions. They are required. Is that when ECHO insists? Yes. And who do they need to insist to? Malta? So according to O.W., if you turn to their papers in multiple places, they have said that the insistence would need to be, in fact, Mr. O'Connor said it today in argument, that the insistence would need to be to O.W. Malta. And their papers say exactly the same thing, that insistence to O.W. Malta constitutes the insistence to trigger L-4. So Malta then becomes the gateway for a choice of law in a separate and independent contract that you entered into with O.W. U.S.A. By the terms of L-4 and by O.W.'s admission, absolutely, it certainly does. So NCL, you never knew about this, did you? No, and, in fact, L-4 says there's no requirement that we read it. We are deemed to have read it if these facts occur, and what are those facts? Well, except that A-3, as Judge Forrest points out, also requires that any, with regard to general terms and conditions, none of the party won't apply unless expressly accepted in writing. So how is it, I mean, how is NCL to know all of a sudden that Greek law is going to apply on two contracts down between independent parties? I'm not suggesting that NCL was required to know. In fact, O.W. was allowed to modify its contract without any notice to NCL at all. Its terms and conditions say it can. Who's the buyer in the Malta EKO contract? Malta. Ah, and so that buyer, but how does that buyer then, that buyer's acceptance then, impute to the buyer NCL in the NCL O.W. Malta, or O.W. U.S. contract? Sure. So what? The O.W. Malta O.W. U.S. contract didn't impose Greek law, did it? No, it did not. So by the terms of L-4, it says, I didn't write the contract, obviously O.W. did, it says if the third-party supplier insists that its terms and conditions apply, the buyer, sorry, those terms and conditions basically supersede the terms and conditions. Subject to variation. Sorry, subject to variation, right, of these terms and conditions. Well, there is a third-party supplier. There is a different choice of law and foreign provision, and on the other condition, which is insistence, a lot of briefing, a lot of legal opinions on what constitutes insistence. Let me offer this, and we've argued it in our papers. You have a party, again, in O.W. Malta, sorry, in O.W. Malta that says, I need fuel from ECHO. ECHO says, sure, on my terms and conditions. I would submit, Your Honor, that is insistence. I'm not sure what else a party is supposed to do. It's pretty well settled that if you have, you're seeking a service, right, and the other party says, I'll give you that service but on my terms and conditions, and then that service is performed, which is the evidence before the court. In fact, even without the declarations, which overwhelmingly the evidence in this case, all the declarations, the only evidence provided supports the fact that O.W. Malta knew about the terms and conditions, that they applied to NCL, that they applied to O.W. Malta, but just on the basis of what we know, even independent of those declarations, Your Honor, what we have is offer and acceptance and performance. If that's not insistence, what were the parties to do? So were they supposed to, they couldn't jump up and down and say, I insist, I insist. It was accepted. If I said to you, Your Honor, I insist that you sell me your car, well, I haven't done a whole lot. But if we agree on terms, I'm sorry, Your Honor. No, no, go ahead and finish. I apologize. No, if we agree on terms, offer acceptance and performance, clearly that has to exceed anything, any insistence. Insistence is the first act. Under their logic, there could be no insistence without resistance. There could be no modification of the terms unless somebody jumped up and down and insisted. The other side of that, of course, is that this clause prevents somebody from saying to the supplier of the fuel, look, why don't you put into this that we'll arbitrate in Lagos, Nigeria? That would not pass the requirement of Article L-4. Insistence, to me, means it's a condition. And after all, the supplier of the fuel has a lot of power because otherwise the cruise ship is not going to chug away anywhere. And that's a very important consideration in the context of what's going on here. O.W. doesn't have fuel all over the world. They rely on third-party suppliers. And guess what? Those third-party suppliers drive the bus, okay? They say they need fuel, and note that the fuel supply here, like many others, is only days in advance. So if O.W. Malta said to any party, hey, I need fuel, but you're going to apply, you're going to take my terms, they wouldn't be able to provide fuel. In Piraeus, there's three main suppliers. That's a huge shipping port. In other places — But the district court — forgive me for interjecting. Yes, sure. The district court seemed to take, as I suggested to opposing counsel, a leap of logic, that O.W. Malta knew EKO, they worked in the same environment, they had the same practices and reliances, and on the basis of that, he found insistence. Is that sufficient, I ask? I would say that he had — yes, Your Honor, he did rely on that in part, and I agree with you. He relied on the factual background, the history and course of dealings. He relied upon the declarations of Bakhtis, the general manager, and legal counsel to O.W. Malta. He relied upon the declaration of Voskos, the general counsel for EKO, both sides of the transaction. But why didn't you just produce your acceptance of the O.W. Malta contract, which would say in it, accepted but for the fact that Greek law will apply? You didn't do that. I'm sorry, can you say that one more time, Your Honor? I didn't follow. Did you produce a document that showed your acceptance of O.W. Malta's request for fuel, which said that delivery was conditioned upon Greek law applying and the choice of form? No, Your Honor, but the document — So how did you insist? Because you simply showed up and delivered the fuel? Excuse me. I'm sorry. Delivered the fuel, and somehow O.W. Malta knew that you wanted it to be governed by Greek law? No, Your Honor. EKO insisted, and that's what was required. I meant EKO. I apologize. It's my fault. EKO insisted. How did EKO insist? EKO insisted by when the request came in from Malta, it imposed its terms and conditions. They are in the record. That is the contract. Just like as between us and O.W. USA, you asked where's the contract. There is a contract. The same contract, the same type of contract that exists between O.W. USA and us exists between EKO and Malta. It's just the terms and conditions. There's no other magical document. That's the contracts. That's an O.W. document. What document came from EKO saying, okay, terms and conditions, O.W. Malta, fine. So many gallons at such and such a place at such and such a price. There's a ticket. I've seen those. But, you know, it's an order. But where is the response that says Greek law applies? Tell me exactly where in the record so I can go look at it. Sure. The EKO terms and conditions, Your Honor, are at, one second here. Is that contract in the record? Yes, it is. It's A75, well, sorry. Of the appendix? I didn't think so. It is in the record. Yeah, the EKO terms and conditions are in the record, absolutely. A75. I'm going to double check. Mike, will you double check that for me? Yeah, the EKO contract is in the record, absolutely. And it's EKO standard terms and conditions. I'm just trying to double check the reference. Sorry, Your Honor. I'm sorry. A71? A71, sorry, Your Honor. It must be some record. My iPad is taking an hour and a half to load it. Yes, Your Honor, it was 43 pages and four and a half hours. Documents is what it is. That's all right. A71. I'll look at it. So let me ask you, is it your view, then, that the minute that the Malta agreement is altered by EKO's insistence that somehow that modifies the terms all the way up the line? I believe, yes, Your Honor, I believe L4 expressly says that. The court found in the English law . . . Wait, the minute that Malta is confronted with a change in terms, an insistence in change of terms by EKO, that then constitutes, in essence, a demand by Malta of OWUS that those terms and conditions be incorporated into their agreement, which then, in turn, alters the arrangement between OWUS and NCL? With one additional step, but absolutely, Your Honor, yes. What we're saying is that the insistence that's required under L4 is satisfied by EKO saying that its terms and conditions, insisting, requiring, imposing. You can use their definition or ours, either barrister's opinion. The definitions, frankly, don't seem to have a whole lot of distinction. When they impose and require that to perform, their terms and conditions apply. They have a history of dealing going back over a decade. Who did they insist to? Malta? They're insisting to Malta that EKO says our terms and conditions apply. This is your insistence. But you have more than an insistence. You then have acceptance because what happens next is that Malta . . . I'm sorry, EKO performs pursuant to their acceptance. If Malta says no, no thank you. EKO is likely not going to perform. They have not . . . we haven't objected to any other terms. Can I produce a curious result as between you and OWS that somehow in terms of understanding what law applies between the two of you, the insistence of somebody way down the line that's relevant to their dispute with their immediate procure somehow governs your relationship in the subsequent agreement? That doesn't sound like protecting the third-party supplier. It sounds like altering a relationship that the two of you have made. In context, Your Honor, if I can offer. What I think . . . EKO is not involved in your arbitration, is it? No, they're not. So the term or condition imposed by EKO governs now your commercial relationship between the person that you originally contracted with, although they themselves never in any way, shape, or form demanded a change of law in the form selection of the contract between the two of you. Yes, Your Honor, and can I just say why? And I've already stated . . . That doesn't trouble you at all. Well, it doesn't trouble me because OWS' contract was drafted with a recognition, again, that they were going to be dealing with third-party suppliers all over the world.  And if you look at L4, not just . . . And so therefore, vis-a-vis the third-party supplier, the terms and conditions are altered as to the third-party supplier. But what has . . . wait a second. Just calm down. Yes, sir. This is not easy. And so the reason why we're interested is because we're trying to figure it out. Sure. So you can either help us or not. I'd love to help you. Okay. So I understand why that provision's in there. It makes sense to me. And believe me, I've seen it a million times already because of the ING cases. Okay? All seven or eight of them, whatever they were. But I'm having trouble understanding why we would alter the contract as between the two of you when it has no relevance with regard to your relationship. Go ahead. Yes. Because L4 says we do. And because the L4 provisions were drafted by O.W. USA, or O.W., the bunker group, for the benefit of O.W. If you look at that provision, and particularly if you look under L4 at the other provisions that says when the third-party suppliers . . . Look at 1, 2, 3, and 4, Your Honor, in those terms and conditions. Every one of those provisions directly benefits O.W. Oh, yeah. I understand. And this was intended to as well in the sense that they did not want to have a dispute where ECHO had raised a challenge, and there was some issue or a claim or something else, and it related to us, and it related to NCL and to O.W. USA, and they could end up in, legitimately, multiple different forums over the same or very related dispute. This was intended to stop that by having one that went back to back to back. And remember, you've got O.W. USA at the head with, yes, their terms and conditions going to O.W. Malta. Same terms and conditions, including L4. Malta to ECHO, right? I'm sorry. Malta to ECHO. It was the same. I'm sorry. O.W. USA to us. O.W. USA to U.S. Malta, right? The same terms and conditions, back to back to back. I see. So what you're saying is that because they anticipated that the suppliers would be requiring this, you're saying that you would run it all the way up the line because that way all the disputes would be at least in one place. Absolutely, Your Honor. And I would submit in the record it's clear that our barrister, Chiara, Mander, Judge Haight, and, in fact, in their papers, O.W. has said insistence to O.W. Malta triggers L4. Yeah. The debate seemed to be about whether there was or was not insistence as opposed to the thing that seems to trouble me. Yeah. And I think on both points, again, there's a substantial record. Thank you. Yes. Thank you, Your Honor. We'll hear rebuttal. Doesn't that make sense? Yes, Your Honor, it does make sense. The district court here has held that O.W. Malta's acceptance was enough to trigger Clause L4, and Norwegian is saying that echoes insistence that O.W. Malta is bound is enough to trigger L4. But that is not the right question under this analysis. Well, Clause L4 says it specifically refers to the buyer with a capital B. That buyer is Norwegian. So the question is whether ECHO has insisted that Norwegian is bound by ECHO's green form selection clause. L4 says these terms and conditions are subject to variation in circumstances where the physical supply of the bunkers is being undertaken by a third party which insists that the buyer is bound. So that's what we have. I mean, isn't that a practical necessity? You have a cruise ship or an ocean-going vessel and it needs fuel. The captain is supposed to negotiate and say, I don't like your terms and conditions. Let's sit down and discuss this, and it will take maybe the time it takes for a legal issue to be resolved by negotiation while the ship sits there for a couple of days. With 1,000 people on board? With 1,000. Your Honor, the ship certainly needs fuel, and the ship made a decision here to purchase that fuel from O.W. Bunker USA. How O.W. Bunker USA went about physically delivering and supplying that fuel is not relevant. If O.W. USA had failed to ---- They arranged for the physical supply to be undertaken by a third party which has terms and conditions. Conditions of doing a thing sounds like an insistence on it. Yes, Your Honor, and the insistence is the key here, and it's the insistence that Norwegian is bound. Now, if you go and ---- I see. So what you're saying is that because they didn't specifically communicate it to NCL as opposed to just Malta, and they would have a good reason to want to communicate it to NCL if they were ultimately going to try and assert a lien of some sort, at least in a U.S. port they would, because the lien would only arise upon the ship's request for the fuel to be refueled under U.S. law. I don't know what it is under Greek law, but so that makes sense too also in some ways, confusing, but there is a reason why you would want the ship itself to agree to this, right? To agree to ---- To changing the choice of law. Not necessarily, Your Honor. But from the supplier's standpoint, from EKO's standpoint, L4, you just said L4 was, they didn't make a demand of NCL. Correct. And you say that they have to do that to comply with L4, right? Yes. There are two questions under L4. There is who is the assistance communicated to and who is supposed to be bound by such insistence. It's that second question where we're getting tripped up. I see. It's the insistence has to be that Norwegian Cruise Lines is bound by EKO's Forum Selection Clause. Were they even aware of these terms? Were they even aware of the change of the place of negotiation when they got the oil put into its tanks? Your Honor, there is no evidence on the record yet. NCL, who you seek to hold to this change, to the original contract, was not even made aware of a change when EKO supplied it with the bunkers. Isn't that correct? Your Honor, I don't believe there was a change in OW's standard terms and conditions. It calls for a London arbitration. Norwegian was certainly aware that there was a London arbitration clause. There was no change from the London arbitration, but NCL argues that there was. Were they even made aware of any potential change at the time the oil was supplied to the ship? Your Honor, there is no evidence in the record. There is no correspondence from EKO. There is no correspondence from OW Malta. In fact, you had asked earlier whether the contract between OW Malta and EKO was part of a record. The answer is no. The complete contract is not in the record, and that's one of the reasons why the district court has ordered OW USA to go out and find evidence of the commercial relationship, the communications, the negotiation between OW Malta and EKO. Part of the argument here on appeal today is that the imposition of the burden of proof on OW USA as a party who is not seeking permanent injunctive relief is incorrect. The burden of proof should rest on Norwegian. You know, we have right now one declaration, self-serving, conclusory, unsupported by documentary evidence. There's no contract, even though EKO was a party to that contract. There's no correspondence. My question is, how did Norwegian know that all of a sudden, or Ab initio, it was bound to arbitrate in London? How would they know whether or not that changed with the delivery of the oil? Your Honor, that's part of OW Bunker's standard terms and conditions, and if we look at the course of dealing and the history between OW USA and Norwegian, that has always been a part of OW's standard terms and conditions. She didn't answer that foolish question. She asked how would they know if it had been changed. How would they know if it had been changed? How would NCL know it had been changed from London to someplace else? The contract, Your Honor, had referenced earlier clauses A2 and A3, and any amendments to the contract would have had to have been accepted in writing. No, I don't think the question is that confusing. Can I ask how Norwegian would know that by the acceptance of the delivery of the oil, either the original duty to arbitrate in London or a changed duty to arbitrate in Piraeus existed? How would they know that the delivery of the oil affected a change, if any? Your Honor, I'm not certain of the answer to that question. Any amendments to the contract would have to be accepted in writing, and if we had continued to develop. Did NCL accept any changes in writing? No, Your Honor. I take it the answer is they wouldn't know, or they didn't know. Your Honor, we haven't gotten to a point in the discovery process yet where we've been able to put that question to anybody. We haven't, in fact, OW USA hasn't answered the complaint yet, so we are not in the discovery stage. This is just a preliminary injunction before us. That's correct, Your Honor, and the injunction will become permanent if OW USA does not come forward with evidence to refute the factual inferences that have been drawn by the district court, and I believe that the burden of proof being imposed on OW USA in that context is incorrect. Thank you both. Thank you, Your Honor. Reserve decision.